******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

PURSUIT PARTNERS, LLC, ET AL. *v.* REED
SMITH, LLP, ET AL.
(AC 41551)

Elgo, Moll and Devlin, Js.

*Syllabus*

The plaintiffs, M Co., O Co. and P Co., sought to recover damages from the
defendant R Co., a law firm, for breach of contract for its alleged violation
of a confidentiality provision of a settlement agreement executed by
the plaintiffs and A Co., to which R Co. was a signatory. The plaintiffs
and A Co. had executed a confidential settlement agreement to resolve
certain litigation and arbitration proceedings. Thereafter, A Co. brought
a related action, *Alpha Beta Capital Partners*, *L.P.* v. *Pursuit Investment
Management*, *LLC*, (193 Conn. App. 381) (*Alpha Beta*), seeking damages
for the alleged failure of the defendants, which included the plaintiffs
in the present case, to provide A Co. with its proportionate share of the
litigation proceeds secured by the settlement agreement. In *Alpha Beta*,
the trial court found that the delayed payment of the proceeds to A Co.
constituted a material breach of the settlement agreement by certain
defendants in that action, relieving A Co. of its confidentiality obligations
thereunder, and this court held that the court's finding was not clearly
erroneous. Subsequently, the plaintiffs commenced this action against
R Co., alleging that R Co. breached the confidentiality provision of the
agreement when it communicated with S Co. in connection with litiga-
tion involving the plaintiffs in the present case. The trial court granted
the motion for summary judgment filed by R Co. on defensive collateral
estoppel grounds, concluding that, in *Alpha Beta*, the defendants were
determined to be the culpable parties, excusing further adherence to
the confidentiality provisions by A Co., and, once the court had ruled
in favor of A Co., it found that R Co.'s obligation pursuant to the confiden-
tiality provisions of the agreement also was excused. *Held:*

1. The plaintiffs could not prevail on their claim that the trial court improperly
concluded that R Co. was bound by the confidentiality provision of the
settlement agreement only to the extent of its client, A Co., which was
based on their claim that the language of the agreement, coupled with
R Co.'s signature on the agreement, was ambiguous and created a genu-
ine issue of material fact regarding the capacity in which R Co. signed
the agreement: the agreement was a contract that was entered into
among A Co. and the plaintiffs and certain other companies for the
principal purpose of settling certain litigation and arbitration proceed-
ings; it was undisputed that R Co. was not a named party to the agree-
ment, and the language of the agreement repeatedly referred to the
parties and their respective counsel, indicating that R Co.'s obligations
flowed from its role as A Co.'s counsel and, furthermore, R Co. signed
the agreement as counsel for A Co.; viewing the agreement as a whole,
this court concluded that any confidentiality obligation that R Co. under-
took was limited to the extent of the obligation of A Co., its client;
moreover, the trial court properly concluded that a certain affidavit on
which the plaintiffs relied in opposition to R Co.'s motion for summary
judgment did not create a genuine issue of material fact but, rather,
contained conclusory allegations that did not constitute evidence suffi-
cient to establish the existence of disputed material facts.

2. The trial court properly concluded that the finding in *Alpha Beta* that A
Co. had been released from its confidentiality obligations under the
settlement agreement by virtue of the material breach of the settlement
agreement by certain defendants in that action had collateral estoppel
effect that extended to R Co., as an agent of A Co.: it was undisputed
that A Co. was released from compliance with the confidentiality provi-
sions of the settlement agreement as a result of the prior material breach
of that agreement by the defendants in *Alpha Beta*, and, in the absence
of an independent contractual obligation on the part of R Co. to comply
with the agreement that was untethered to its role as counsel for A Co.,
this court could conceive of no reason why collateral estoppel principles
should not apply under the limited circumstances of this case; moreover,

the fact that R Co. was not a party to the related action in *Alpha Beta* did not militate against its defensive use of collateral estoppel.

Argued October 9, 2019—officially released June 9, 2020

*Procedural History*

Action to recover damages for breach of contract, and for other relief, brought to the Superior Court in the judicial district of Stamford-Norwalk, where Pursuit Opportunity Fund I, LP, was substituted for the named plaintiff, and Pursuit Capital Management Fund I, LP, was added as a plaintiff; thereafter, the action was withdrawn as to the defendant John Scott et al.; subsequently, the court, *Hon. Kenneth B. Povodator*, judge trial referee, granted the named defendant's motion for summary judgment and rendered judgment thereon, from which the plaintiffs appealed to this court. *Affirmed.*

*Sabato P. Fiano*, for the appellants (substitute plaintiff et al.).

*William N. Wright*, with whom, on the brief, were *John W. Cannavino* and *Robert M. Abrahams*, pro hac vice, for the appellee (named defendant).

*Opinion*

MOLL, J. The plaintiffs Pursuit Investment Management, LLC (PIM), Pursuit Opportunity Fund I, LP (POF), and Pursuit Capital Management Fund I, LP (PCM) (plaintiffs), appeal from the judgment of the trial court granting summary judgment in favor of the defendant Reed Smith, LLP (Reed Smith). POF and PCM are hedge funds[1] to which PIM provided investment management and advisory services. Reed Smith is a law firm that represented Alpha Beta Capital Partners, L.P. (Alpha Beta), an investor in POF and PCM. In the present action, the plaintiffs claim that Reed Smith violated a confidentiality provision of a settlement agreement executed by, among others, Alpha Beta and the plaintiffs, to which Reed Smith was a signatory. On appeal, the plaintiffs argue that the trial court erred by concluding that (1) the language of the settlement agreement bound Reed Smith to the confidentiality provision only to the extent of its principal, Alpha Beta, and (2) a finding in a related action, *Alpha Beta Capital Partners, L.P.* v. *Pursuit Investment Management, LLC*, 193 Conn. App. 381, 415, 219 A.3d 801 (2019), cert. denied, 334 Conn. 911, 221 A.3d 446 (2020) (*Alpha Beta*)[2]— namely, that the Pursuit Parties' material breach of the settlement agreement effectively released Alpha Beta from its confidentiality obligations thereunder—was entitled to collateral estoppel effect that extended to Reed Smith, as an agent of Alpha Beta.[3] We affirm the judgment of the trial court.

In order to put the present appeal in its proper context, we begin with an abbreviated recitation of the complex factual and procedural history of the related action, as recently set forth by this court in *Alpha Beta*. "In approximately 2007, [Alpha Beta] invested in both POF and PCM. . . . Also invested in POF and PCM at that time was the Schneider Group . . . . In 2007 and 2008, all of the [Pursuit Parties] were experiencing significant financial difficulties as a result of the volatility of the global securities market. More specifically, in 2007, POF Master and PCM Master had purchased certain securities known as collateralized debt obligations (CDOs) from UBS AG, or its affiliate, for substantial sums of money. Shortly thereafter, the value of the CDOs precipitously dropped and, in 2008, Pursuit Partners and PIM commenced a civil action in the Connecticut Superior Court against UBS AG and Moody's Corporation (UBS litigation) . . . .

"In 2010, [Alpha Beta] commenced a civil action in the Supreme Court of the state of New York (2010 New York action) against PIM, [Anthony] Schepis, and [Frank] Canelas [Jr.]. Therein, [Alpha Beta] alleged that [those parties] were liable for substantial damages caused by their 'tortious conduct involving the management of its investments in the hedge funds.' Contemporaneously, [Alpha Beta] filed a separate arbitration pro-

ceeding against POF and PCM, claiming similar losses for similar tortious conduct. In that proceeding, [Alpha Beta] alleged, among other things, that one or more of the [Pursuit Parties] had paid themselves compensation on the basis of a highly inflated value of the CDOs, notwithstanding their knowledge that the CDOs had little or no value.

"On or about April 8, 2011, [Alpha Beta], PIM, Schepis, Canelas, Pursuit Management, POF, and PCM executed the 'Confidential Settlement Agreement and Mutual Release' (CSA) to resolve the 2010 New York action and the arbitration proceeding. The CSA was comprised of fifteen sections and provided at the outset that 'the parties hereby agree as follows . . . .' In §§ 1, 2, 5, and 6, the CSA provided that [Alpha Beta] was to execute a dismissal with prejudice as to both the 2010 New York action and the parallel arbitration proceeding, and that [Alpha Beta] agreed to a mutual release with PIM, Schepis, Canelas, Pursuit Management, POF, and PCM of all claims that were, or could have been, raised therein.

"As consideration for [Alpha Beta's] withdrawal and release, § 3 of the CSA required PIM to pay [Alpha Beta] a settlement payment of $2.2 million and a redemption payment of $1,418,033. Pursuant to § 3 (b) (i) and (iii) of the CSA, the amount of the redemption payment represented [Alpha Beta's] pro rata share, approximately 32.083612 percent, of the net asset value (NAV) in PCM as of February 28, 2011, minus a holdback[4] of '$250,000 for the purpose of funding necessary costs . . . associated with the ongoing [UBS litigation]' and minus 'an additional holdback in the amount [of] $200,000 to pay legal fees and expenses with respect to which PCM has an obligation to indemnify.' Section 3 (b) (ii) of the CSA provided detailed mandates regarding these holdbacks, including that PIM shall not use any prior holdbacks in connection with the UBS litigation, that [Alpha Beta] shall 'be entitled to periodic updates on the status of the holdbacks,' and that [Alpha Beta] 'will be provided with the opportunity to pay additional expenses necessary for the UBS [l]itigation' if the UBS litigation holdback was insufficient.

"In addition, § 4 of the CSA secured [Alpha Beta's] interest in two of PCM's contingent assets. . . . These contingent assets include (a) PCM's proportionate interest in the UBS [l]itigation; and (b) PCM's interest in a claim against Lehman Brothers International (Europe) . . . in the amount of approximately $14,000,000 [(LBIE claim)]. . . .

"Section 7 of the CSA was a confidentiality provision in which the parties agreed, among other things, 'to maintain in the strictest confidence and not disclose . . . the contents and terms of [the CSA] . . . [and] not to use or provide any information relating to any claim arising out of an investment in the [f]unds to any

other person in connection with the initiation of any lawsuit, claim, arbitration or action related to or concerning any investment in PCM, POF or any other investment vehicle managed by PIM.' Section 12 of the CSA was a choice of law provision that provided: 'This [a]greement shall be construed and interpreted in accordance with the laws of the [s]tate of New York. Any disputes or litigation arising out of this [a]greement shall be governed by New York law.' . . .

"Shortly after the CSA was signed, the LBIE claim was sold for $9,334,141.55, and, on June 1, 2011, those funds were received [by PCM Master]. Nevertheless, no portion of the LBIE claim proceeds were remitted to [Alpha Beta] until October, 2011, when [Alpha Beta] received $1,022,022.36.[5] Thereafter, a series of communications occurred between Reed Smith and DLA Piper[6] regarding the distribution of the LBIE claim proceeds to [Alpha Beta].

"On November 9, 2011, DLA Piper sent an explanation to Reed Smith, stating that [Alpha Beta's] contingent interest in the LBIE claim was worth $2,691,641, which amount represented 32.08 percent of PCM's 90 percent interest in the LBIE claim owned by PCM Master, and that a performance fee also would be subtracted from that amount. On November 16, 2011, Reed Smith sent a letter in response, asserting that the [Pursuit Parties] had provided no documentation to support their valuation of [Alpha Beta's] proportionate interest in the LBIE claim, that Reed Smith had been in contact with the Schneider Group and their related entities, and that the Schneider Group was supporting [Alpha Beta's] demands. On November 26, 2011, DLA Piper sent another explanation to Reed Smith, stating that [Alpha Beta's] interest in the LBIE claim was reduced to $2,132,559 to account for the performance fee due to the [Pursuit Parties], and that [Alpha Beta's] 'reserve balance in May, 2011, was adjusted upward in that amount.' Neither of DLA Piper's communications provided an explanation as to the basis for the performance fee or the balance reserve, nor the reason for which the [Pursuit Parties] had remitted less than 48 percent of the total amount that they finally had calculated [Alpha Beta's] interest in the LBIE claim to be worth. The [Pursuit Parties] did not remit any further amount of the LBIE claim at that time. . . .

"In March, 2013, after having received no further communication regarding the LBIE claim and concerned about the status of its holdbacks, [Alpha Beta] commenced a civil action in the Supreme Court of the state of New York against PIM, PCM, POF, and Pursuit Management (2013 New York action). In that action, [Alpha Beta] alleged that those defendants had breached the CSA by failing to pay [Alpha Beta] its pro rata portion of the LBIE claim proceeds, and by failing to provide [Alpha Beta] with periodic updates on the status of its

holdbacks and contingent assets. . . .

"Soon after the commencement of the 2013 New York action, the [Pursuit Parties], or some of them, transferred to [Alpha Beta] approximately $700,000 in additional proceeds from the LBIE claim, for a total distribution of $1,722,022.36, which was approximately 81 percent of the total amount that the [Pursuit Parties] finally had calculated [Alpha Beta's] interest in the LBIE claim to be worth. The transmittal of the $700,000 was not accompanied by any explanation or accounting as to how the amount was calculated, the balance of the LBIE claim proceeds, or the status of the holdbacks. . . .

"In August and September, 2015, Pursuit Partners settled the UBS litigation for a total of $36 million; however, the [Pursuit Parties] have not provided [Alpha Beta] with any portion of the settlement proceeds." (Footnotes added and omitted.) *Alpha Beta*, supra, 193 Conn. App. 391–98.

As a result, Alpha Beta brought the related action against the Pursuit Parties in Connecticut Superior Court seeking damages for their alleged failure to remit to Alpha Beta its share of the UBS litigation proceeds. Id., 398. Alpha Beta's operative complaint comprised seven counts: (1) breach of the CSA; (2) breach of the covenant of good faith and fair dealing; (3) unjust enrichment; (4) conversion; (5) statutory theft under General Statutes § 52-564; (6) violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq.; and (7) civil conspiracy. Id. The Pursuit Parties' operative two count amended counterclaim asserted claims for breach of the CSA and fraud. Id., 399. "In particular, the [Pursuit Parties] alleged that [a] November, 2011 letter from Reed Smith to DLA Piper referencing [Alpha Beta's] communication with the Schneider Group, as well as the commencement of the 2013 New York action, had breached certain provisions of . . . the CSA . . . ." Id. Following a bench trial, the trial court, *Genuario, J.*, rendered judgment in favor of Alpha Beta on counts one and two of its complaint as to those defendants that were parties to the CSA, and on both counts of the Pursuit Parties' counterclaim. Id., 400–401. The court rendered judgment in favor of Pursuit Partners, PCM Master, and POF Master on counts one and two of the complaint and in favor of all of the Pursuit Parties on counts three through seven of the complaint. Id., 401. Particularly relevant for purposes of this appeal, the trial court in the related action made a finding, which was left undisturbed on appeal, namely, that the Pursuit Parties' prior partial delayed payment of the LBIE claim to Alpha Beta constituted a material breach of the CSA that, under New York law, relieved Alpha Beta of its obligations under the confidentiality provision of the CSA. Id., 413–15, 413 n.20.

On appeal, this court affirmed in part and reversed in part the judgment.[7] Id., 390. We held in relevant part that the trial court's finding that the Pursuit Parties' partial delayed payment of Alpha Beta's proportionate share of the LBIE claim relieved Alpha Beta of its obligations under the CSA's confidentiality provision was not clearly erroneous. Id., 413–15. Because the Pursuit Parties' breach in that regard occurred prior to Alpha Beta's communications with the United States Securities and Exchange Commission (SEC) and the Schneider Group, this court held that the trial court properly rejected the Pursuit Parties' breach of contract counterclaim. Id., 415.

Against this backdrop, we now turn to the relevant procedural background of the present action. In December, 2015, Pursuit Partners and PIM commenced the present action against Reed Smith, John Scott, who is a member of Reed Smith, and Philip Chapman, a principal of Alpha Beta. On April 20, 2016, the action was withdrawn as to Scott and Chapman. On April 25, 2016, POF was substituted as a plaintiff for Pursuit Partners, and PCM was added as a plaintiff. On January 18, 2017, the plaintiffs filed the operative amended complaint against Reed Smith, alleging one count of breach of contract. Specifically, the complaint alleged that Reed Smith breached the confidentiality provision of the CSA when Reed Smith communicated with, provided information to, and otherwise assisted the Schneider Group in separate litigation involving several of the Pursuit Parties.

On May 8, 2017, Reed Smith filed a motion for summary judgment, a supporting memorandum of law, a supporting affidavit from William N. Wright, Esq., and appended exhibits. In support of its motion, Reed Smith argued, inter alia, that the plaintiffs' claim was barred on collateral estoppel grounds because the issue of the plaintiffs' prior material breach of the CSA, and the resulting release of Alpha Beta from its confidentiality obligations, was fully and fairly litigated, actually decided, and necessary to the judgment in the related action. Reed Smith contended that the principal basis for the motion was that any alleged breach of the confidentiality provision of the CSA on its part occurred after the plaintiffs materially breached the CSA by refusing to remit the LBIE claim settlement proceeds. Reed Smith further argued that, because the trial court in the related action considered the Pursuit Parties' breach to be "material," both Alpha Beta and Reed Smith were excused from performance under the CSA. On August 25, 2017, the plaintiffs filed their memorandum in opposition to Reed Smith's motion for summary judgment, as well as a supporting affidavit from Canelas (Canelas affidavit) and appended exhibits.[8]

On March 26, 2018, the trial court, *Hon. Kenneth B. Povodator*, judge trial referee, issued a comprehensive

memorandum of decision, granting Reed Smith's motion for summary judgment on collateral estoppel grounds.[9] In connection with its collateral estoppel discussion, the court began with a review of the confidentiality provision, set forth in § 7 of the CSA, quoted previously in this opinion. Focusing in relevant part on the language obligating each signatory "not to use or provide any information relating to any claim arising out of an investment in the [f]unds to any other person in connection with the initiation of any lawsuit, claim, arbitration or action related to or concerning any investment in PCM, POF or any other investment vehicle managed by PIM," the court concluded that such language could not reasonably extend to Reed Smith's communications with the SEC.[10] The court then examined Reed Smith's alleged communications with the Schneider Group. Acknowledging that these communications "appear to come within the scope of [§ 7 of the CSA] . . . or at least [were] sufficiently likely to be so categorized as to present a material issue of fact, unless otherwise explained or justified or excused," the court stated that "[t]he documents submitted . . . all reflect conduct of Alpha Beta through [Reed Smith] as its attorneys," and that "there has been no suggestion of any basis or reason why [Reed Smith], while representing Alpha Beta, might be communicating with the [Schneider Group] other than in furtherance of the interests of its client . . . ." Rather, Reed Smith's alleged "conduct seem[ed] to have been directed to applying pressure to the [Pursuit Parties] to provide the amounts claimed to be due to Alpha Beta." Turning to the findings underlying Reed Smith's collateral estoppel argument, the court observed that "[t]he court [in the related action] was addressing conduct that primarily if not exclusively was that of [Reed Smith], acting on behalf of Alpha Beta as the client."

The court then rejected the plaintiffs' argument that because Reed Smith was a separate signatory to the CSA, the language of the confidentiality provision binding "the [p]arties and their respective counsel" separately obligated Reed Smith, irrespective of whether Alpha Beta had been excused from its own confidentiality obligation. Noting the "irrationality" of a result in which an agent, i.e., Reed Smith, could be liable for a breach of confidentiality when its principal, i.e., Alpha Beta, had already been excused from the identical obligation with respect to the same communication, the court concluded that, in the related action, "[the plaintiffs] were determined to be the culpable parties, excusing further adherence to the confidentiality provisions—and the conduct of Reed Smith was the primary if not the sole focus of the Pursuit [Parties'] claims. While perhaps not framed in this manner, effectively the conduct of the [Pursuit Parties] had frustrated the purpose of the obligation of confidentiality, including as to Reed Smith once the court had ruled in favor of

Alpha Beta with respect to the claim that it had breached its confidentiality obligation." This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

The plaintiffs first claim that the language of the CSA does not support the trial court's conclusion that Reed Smith was bound by the CSA's confidentiality provision only to the extent of its client, Alpha Beta. Reed Smith maintains that the trial court properly concluded that it signed the CSA solely in its representative capacity as Alpha Beta's agent, and that the plaintiffs' position that Reed Smith was effectively a separate obligor under § 7 of the CSA would lead to nonsensical results. We agree with Reed Smith.

We begin by setting forth the standard of review and applicable legal principles. "Practice Book § 17-49 provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. A party moving for summary judgment is held to a strict standard. . . . To satisfy his burden the movant must make a showing that it is quite clear what the truth is, and that excludes any real doubt as to the existence of any genuine issue of material fact. . . . As the burden of proof is on the movant, the evidence must be viewed in the light most favorable to the opponent. . . . When documents submitted in support of a motion for summary judgment fail to establish that there is no genuine issue of material fact, the nonmoving party has no obligation to submit documents establishing the existence of such an issue. . . . Once the moving party has met its burden, however, the opposing party must present evidence that demonstrates the existence of some disputed factual issue. . . . It is not enough, however, for the opposing party merely to assert the existence of such a disputed issue. Mere assertions of fact . . . are insufficient to establish the existence of a material fact and, therefore, cannot refute evidence properly presented to the court under Practice Book § [17-45]. . . . Our review of the trial court's decision to grant [a] motion for summary judgment is plenary." (Emphasis omitted; internal quotation marks omitted.) *Capasso* v. *Christmann*, 163 Conn. App. 248, 257, 135 A.3d 733 (2016).

"The standard of review for the interpretation of a contract is well established. Although ordinarily the question of contract interpretation, being a question of the parties' intent, is a question of fact [subject to the clearly erroneous standard of review] . . . [when] there is definitive contract language, the determination of what the parties intended by their . . . commitments is a question of law [over which our review is plenary]. . . . In light of the fact that the [plaintiffs']

claim is directed at the court's interpretation of the [CSA], as opposed to the court's factual findings, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record." (Citation omitted; internal quotation marks omitted.) *Alpha Beta*, supra, 193 Conn. App. 403.

To determine the capacity in which Reed Smith signed the CSA, we continue by setting forth the applicable contract interpretation principles under New York law.[11] "[W]hen parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms . . . . We apply this rule with even greater force in commercial contracts negotiated at arm's length by sophisticated, counseled businesspeople . . . . In such cases, courts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include . . . . [C]ourts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing . . . . We instead concern ourselves with what the parties intended, but only to the extent that they evidenced what they intended by what they wrote . . . . Accordingly, before assessing evidence regarding what was in the parties' minds at the time of the agreement, we must first look to the agreement itself." (Citations omitted; internal quotation marks omitted.) *Ashwood Capital, Inc.* v. *OTG Management, Inc.*, 99 App. Div. 3d 1, 7, 948 N.Y.S.2d 292 (2012).

"A contract is ambiguous if the language used lacks a definite and precise meaning, and there is a reasonable basis for a difference of opinion . . . ." (Citations omitted; internal quotation marks omitted.) *Agor* v. *Board of Education*, 115 App. Div. 3d 1047, 1048, 981 N.Y.S.2d 485 (2014). It is well established that, in order to determine whether an ambiguity exists under the CSA, we "should examine the entire contract and consider the relation of the parties and the circumstances under which it was executed. Particular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby. Form should not prevail over substance and a sensible meaning of words should be sought." *Atwater & Co.* v. *Panama Railroad Co.*, 246 N.Y. 519, 524, 159 N.E. 418 (1927).

The following additional principles also apply to our resolution of this claim. "Agency is a legal relationship between a principal and an agent. It is a fiduciary relationship which results from the manifestation of consent of one person to allow another to act on his or her behalf and subject to his or her control, and consent by the other so to act. The agent is a party who acts on behalf of the principal with the latter's express,

implied, or apparent authority . . . ." (Citations omitted; internal quotation marks omitted.) *Faith Assembly* v. *Titledge of New York Abstract, LLC*, 106 App. Div. 3d 47, 58, 961 N.Y.S.2d 542 (2013). It is axiomatic that an attorney is an agent for his or her client. See *Aetna Casualty & Surety Co.* v. *Hambly Construction Co.*, 65 App. Div. 2d 612, 613, 409 N.Y.S.2d 552 (1978); see also New York Rules of Professional Conduct 1.2 (a). When a party materially breaches a contract, the non-breaching party's performance thereunder is excused. *Grace* v. *Nappa*, 46 N.Y.2d 560, 567, 389 N.E.2d 107, 415 N.Y.S.2d 793 (1979). A breach is material if it "go[es] to the root of the agreement between the parties." (Internal quotation marks omitted.) *Frank Felix Associates, Ltd.* v. *Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d Cir. 1997) (applying New York law). "A party's obligation to perform under a contract is only excused where the other party's breach of the contract is so substantial that it defeats the object of the parties in making the contract." Id.

Guided by these principles, we turn to the language of the CSA. We first note that the definitions of the terms "[p]arty" and "[p]arties" in the CSA do not include Reed Smith. However, the confidentiality provision of the CSA, set forth in § 7 thereof, provides in relevant part: "The [p]arties *and their respective counsel* agree to maintain in the strictest confidence and not disclose . . . the contents and terms of this [a]greement, including but not limited to the [c]onsideration for this [a]greement. For the avoidance of doubt, this confidentiality provision expressly prohibits, among other things, the issuance of any press release regarding the [a]greement, and the . . . publication of the [a]greement or the terms of the [a]greement. . . . To further ensure the confidentiality of this [a]greement, the [p]arties *and their respective counsel* agree not to use or provide any information relating to any claim arising out of an investment in the [f]unds to any other person in connection with the initiation of any lawsuit, claim, arbitration or action related to or concerning any investment in PCM, POF or any other investment vehicle managed by PIM." (Emphasis added.) Although Reed Smith was not a "[p]arty" to the CSA, the CSA's signature block includes Reed Smith as a signatory with an accompanying parenthetical that reads "counsel for Alpha Beta."

The plaintiffs argue that the language in § 7 directed to "the [p]arties and their respective counsel," coupled with Reed Smith's signature to the CSA, is ambiguous and creates, at a minimum, a genuine issue of material fact regarding the capacity in which Reed Smith signed the CSA. In support of their position, they rely on the principle that a contract is unambiguous only "if the language it uses has a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there

is no reasonable basis for a difference of opinion . . . ." (Citation omitted; internal quotation marks omitted.) *Greenfield* v. *Philles Records, Inc.*, 98 N.Y.2d 562, 569, 780 N.E.2d 166, 750 N.Y.S.2d 565 (2002). The plaintiffs also contend that the Canelas affidavit raised a genuine issue of material fact, specifically, that they would not have entered into the CSA unless Reed Smith agreed to its terms in an individual capacity. Reed Smith argues in contrast that the language of the CSA, including the signature block, demonstrates that it signed the CSA as Alpha Beta's counsel, and that requiring its compliance with the confidentiality provision after Alpha Beta was no longer bound thereby as a result of the plaintiffs' prior material breach would be a nonsensical, overly formalistic interpretation of the contract. We agree with Reed Smith.

The CSA is a contract that was entered into among Alpha Beta and PIM, Pursuit Capital Management, LLC, POF, PCM, Schepis, and Canelas for the principal purpose of settling the 2010 New York action and arbitration proceedings. It is undisputed that Reed Smith was not a named *party* to the CSA. Notably, § 7 of the CSA, the only section directed to the parties' counsel, repeatedly refers to the "[p]arties and their respective counsel," indicating that Reed Smith's obligations thereunder flowed from its role as Alpha Beta's counsel. Moreover, Reed Smith signed the CSA as "counsel for Alpha Beta." Cf. *Pepsi-Cola Buffalo Bottling Corp.* v. *Wehrle Drive Supermarkets, Inc.*, 123 App. Div. 2d 515, 515, 507 N.Y.S.2d 107 (1986) (agent's signature failed to show that he signed guarantee in representative capacity); see also *Georgia Malone & Co.* v. *Rieder*, 86 App. Div. 3d 406, 408–409, 926 N.Y.S.2d 494 (2011) ("agents of a company are not personally liable on a contract if they do not purport to bind themselves individually"), aff'd, 19 N.Y.3d 511, 973 N.E.2d 743, 950 N.Y.S.2d 333 (2012). Viewing the CSA as a whole, we conclude that any confidentiality obligation Reed Smith undertook pursuant to § 7 was limited to the extent of the confidentiality obligation of its client, Alpha Beta.

Any other reading of the CSA would strain the objective intentions of the contracting parties; see *Mencher* v. *Weiss*, 306 N.Y. 1, 7, 114 N.E.2d 177 (1953); and would lead to nonsensical results. See *Reiss* v. *Financial Performance Corp.*, 279 App. Div. 2d 13, 19, 715 N.Y.S.2d 29 (2000) ("Surely a court is not required to disregard common sense and slavishly bow to the written word where to do so would plainly ignore the true intentions of the parties in the making of a contract. Such formalistic literalism serves no function but to contravene the essence of proper contract interpretation, which, of course, is to enforce a contract in accordance with the true expectations of the parties in light of the circumstances existing at the time of the formation of the contract . . . ." (Citations omitted.)), aff'd as modified, 97 N.Y.2d 195, 764 N.E.2d 958 (2001). For example,

taken to its logical conclusion, the plaintiffs' interpretation would have permitted Alpha Beta to communicate with the Schneider Group through anyone other than Reed Smith. Such a result would defy common sense and is incongruent with established contract and agency principles. See *Givati* v. *Air Techniques, Inc.*, 104 App. Div. 3d 644, 645, 960 N.Y.S.2d 196 (2013) (in interpreting contract, sensible meaning of words should be sought); see also *Georgia Malone & Co.* v. *Rieder*, supra, 86 App. Div. 3d 408–409. Rather, we construe § 7 of the CSA as the practical means to prevent a contracting party's circumvention of the confidentiality provision by communicating with third parties through their counsel in an attempt to avoid liability. The plaintiffs' contrary interpretation fails to provide a reasonable basis to conclude that Reed Smith had an ongoing contractual duty to comply with § 7 once Alpha Beta was excused from performance. Accordingly, the plaintiffs' reliance on the principle that an ambiguity exists when there is a reasonable basis for a difference in opinion as to the contract's meaning; see *Greenfield* v. *Phillies Records, Inc.*, supra, 98 N.Y.2d 569; is misplaced.

Furthermore, we, like the trial court, conclude that the Canelas affidavit on which the plaintiffs rely did nothing to create a genuine issue of material fact. The trial court described the Canelas affidavit as follows: "The affidavit of . . . Canelas reads more like a supplemental brief than an affidavit. . . . [M]ost of the recitations seem to have been taken from a brief or draft brief, minimally modified to appear to be assertions by a speaker (the affiant), going so far as to even have section headings such as 'The issues before Judge Genuario and the New York [c]ourts are not the issues before this [c]ourt' . . . ." Among the examples noted by the court was the fact that the Canelas affidavit contained "a conclusion—complete with a heading in all capital letters and in boldface and underlined—reading: 'Based on the foregoing and all of the prior proceedings had herein, Pursuit respectfully requests that the [c]ourt enter summary judgment in its favor on liability . . . .'" The court further noted that the following sentence in the affidavit "epitomize[d] the extreme departure from anything approaching proper content in an affidavit": "'In my view, Reed Smith's reliance on the Appellate Division Decision as barring the instant action on res judicata grounds is wholly without merit.'" The trial court concluded, and we agree, that "most of the twenty-three pages of the affidavit are more in the nature of arguments than competent factual statements, making it especially difficult to discern evidence that the court should consider (*can* properly consider)." What remain in the Canelas affidavit are conclusory allegations that "do not constitute evidence sufficient to establish the existence of disputed material facts." *Gupta* v. *New Britain General Hospital*, 239 Conn. 574, 583, 687 A.2d 111 (1996). The trial court's rebuke of

the Canelas affidavit, and its conclusion that it lacked evidentiary value, were well founded. In sum, on the basis of our careful review of the Canelas affidavit, we agree with the trial court that, upon the proper burden shifting, the affidavit failed to demonstrate that there existed a genuine issue of material fact.

For the foregoing reasons, the plaintiffs' first claim fails.

## II

The plaintiffs next claim that the finding in the related action—that their prior material breach of the CSA excused Alpha Beta from compliance with § 7 of the CSA (a finding that was left undisturbed in *Alpha Beta*)—does not extend to Reed Smith and is not entitled to collateral estoppel effect under the circumstances of the present case. We disagree.

The applicability of collateral estoppel to a particular set of facts presents a question of law over which this court exercises plenary review. *Rodriguez* v. *Saucier*, 108 Conn. App. 599, 601, 948 A.2d 1067, cert. denied, 289 Conn. 917, 957 A.2d 879 (2008). "The common-law doctrine of collateral estoppel, or issue preclusion, embodies a judicial policy in favor of judicial economy, the stability of former judgments and finality. . . . Collateral estoppel . . . prohibits the relitigation of an issue when that issue was actually litigated and necessarily determined in a prior action between the same parties upon a different claim. . . . For an issue to be subject to collateral estoppel, it must have been fully and fairly litigated in the first action. It also must have been actually decided and the decision must have been necessary to the judgment." (Internal quotation marks omitted.) *Birnie* v. *Electric Boat Corp.*, 288 Conn. 392, 405, 953 A.2d 28 (2008). "If an issue has been determined, but the judgment is not dependent upon the determination of the issue, the parties may relitigate the issue in a subsequent action. . . . For collateral estoppel to apply, the issue concerning which relitigation is sought to be estopped must be identical to the issue decided in the prior proceeding. . . .

"An issue is actually litigated if it is properly raised in the pleadings or otherwise, submitted for determination, and in fact determined. An issue is necessarily determined if, in the absence of a determination of the issue, the judgment could not have been validly rendered." (Citations omitted; internal quotation marks omitted.) *State* v. *Joyner*, 255 Conn. 477, 490, 774 A.2d 927 (2001).

At issue in the present case is Reed Smith's defensive use of the collateral estoppel doctrine, which "occurs when a defendant in a second action seeks to prevent a plaintiff from relitigating an issue that the plaintiff had previously litigated in another action against the same defendant *or a different party*. . . . It is well

established that privity is not required in the context of the defensive use of collateral estoppel . . . ." (Citation omitted; emphasis added; internal quotation marks omitted.) *Marques* v. *Allstate Ins. Co.*, 140 Conn. App. 335, 340–41, 58 A.3d 393 (2013).

As a threshold matter, it is undisputed that the issues of whether the Pursuit Parties materially breached the CSA and whether such breach released Alpha Beta from compliance with § 7 of the CSA were actually litigated and necessarily determined in the related action. See *Alpha Beta*, supra, 193 Conn. App. 415 ("the evidence that, prior to any of the contested communications, [Alpha Beta] received less than one half of what the [Pursuit Parties] had calculated was [Alpha Beta's] entitlement, more than four months after the funds had been received by PCM without sufficient justification, supports the court's finding that the [Pursuit Parties] had materially breached the CSA"); id., 413–15 (concluding that evidence supported trial court's finding that Pursuit Parties had materially breached their obligations under CSA in October and November, 2011, prior to any of Alpha Beta's communications with SEC or Schneider Group, and that, as result, under New York law, Alpha Beta was discharged from its obligations under § 7 of CSA). It is also undisputed that the specific communications underlying the plaintiffs' breach of contract claim against Reed Smith in the present action are the identical communications that were at issue in the related action, and that Reed Smith engaged in such communications solely on behalf of its client and principal, Alpha Beta, after the Pursuit Parties materially breached the CSA.[12] In the absence of an independent contractual obligation on the part of Reed Smith to comply with § 7 of the CSA that is untethered to its role and conduct as counsel for Alpha Beta, we can conceive of no reason why collateral estoppel principles—and the specific policy of judicial economy they serve—should not apply under the limited circumstances of this case.[13] Thus, we conclude that the trial court properly concluded that the plaintiffs' breach of contract claim against Reed Smith was precluded on the basis of defensive collateral estoppel.

The plaintiffs argue that the related action did not resolve an "identical issue" in the present action, that is, whether *Reed Smith* was excused from compliance under § 7 of the CSA. The plaintiffs' argument ignores the contract and agency principles discussed in part I of this opinion. Moreover, as stated previously, the fact that Reed Smith was not a party to the related action does not militate against the defensive use of collateral estoppel.[14] See *Marques* v. *Allstate Ins. Co.*, supra, 140 Conn. App. 340–41; *Gionfriddo* v. *Gartenhaus Cafe*, 15 Conn. App. 392, 404, 546 A.2d 284 (1988), aff'd on other grounds, 211 Conn. 67, 557 A.2d 540 (1989).

The judgment is affirmed.

In this opinion the other judges concurred.

[1] "A hedge fund is [a] specialized investment group—[usually] organized as a limited partnership or offshore investment company—that offers the possibility of high returns through risky techniques such as selling short or buying derivatives." (Internal quotation marks omitted.) *Alpha Beta Capital Partners, L.P.* v. *Pursuit Investment Management, LLC*, 193 Conn. App. 381, 390 n.3, 219 A.3d 801 (2019), cert. denied, 334 Conn. 911, 221 A.3d 446 (2020).

[2] The defendants in the related action included POF, Pursuit Opportunity Fund I Master Ltd. (POF Master), PCM, Pursuit Capital Master (Cayman) Ltd. (PCM Master), Pursuit Partners, LLC (Pursuit Partners), PIM, Northeast Capital Management, LLC, Anthony Schepis, and Frank Canelas, Jr. Canelas and Schepis are individuals "who, together, formed, operated, and controlled all of the other defendants [in the related action]." *Alpha Beta*, supra, 193 Conn. App. 390–91. Pursuit Partners was not a party to the appeal in *Alpha Beta*; id., 388–89; and, although Pursuit Partners was the named plaintiff in the present action, it has been substituted as a plaintiff by POF. For ease of reference, we refer to the defendants in the related action, which included the plaintiffs in the present action, as the "Pursuit Parties."

[3] In its appellate brief, Reed Smith offers an alternative basis for affirming the judgment, namely, that the trial court's finding in the related action that the Pursuit Parties suffered no damages was entitled to collateral estoppel effect. Because we reject both of the plaintiffs' claims, we need not reach this alternative argument. See *Capen* v. *General Dynamics Corp./Electric Boat Division*, 38 Conn. App. 73, 80–81 n.7, 659 A.2d 735 (1995).

[4] A holdback is "an amount withheld from the full payment of a contract pending the other party's completion of some obligation . . . ." (Internal quotation marks omitted.) *Alpha Beta*, supra, 193 Conn. App. 392 n.7.

[5] There was an apparent dispute in the related action over the amount Alpha Beta was owed from the LBIE claim proceeds pursuant to the CSA. See *Alpha Beta*, supra, 193 Conn. App. 414–15. However, even assuming that the Pursuit Parties' calculation as to that amount was correct, the figure provided to Alpha Beta in October, 2011, was less than one half of the calculated entitlement. Id., 415.

[6] "During all relevant times, [Alpha Beta] was represented by . . . Reed Smith, and the [Pursuit Parties] were represented by the law firm DLA Piper." *Alpha Beta*, supra, 193 Conn. App. 391.

[7] This court reversed the trial court's determination that Schepis and Canelas were, in part, liable in their individual capacities for damages to Alpha Beta with respect to their purported failure to provide UBS litigation settlement proceeds. *Alpha Beta*, supra, 193 Conn. App. 436–37.

[8] The plaintiffs also simultaneously filed a cross motion for summary judgment as to liability only, which the trial court subsequently determined had been abandoned.

[9] On March 27, 2018, the trial court issued a supplemental order clarifying one aspect of its March 26, 2018 decision and holding that the doctrine of res judicata applied with respect to Reed Smith's November, 2011 letter to DLA Piper. In their principal appellate brief, the plaintiffs do not challenge the court's decision on the basis of res judicata. We therefore do not review the court's supplemental order.

[10] The plaintiffs do not challenge on appeal this particular conclusion.

[11] The parties agree that New York substantive law governs this contractual claim because of the choice of law provision in § 12 of the CSA, which provides in relevant part: "This [a]greement shall be construed and interpreted in accordance with the laws of the [s]tate of New York."

[12] During oral argument before this court, the plaintiffs' counsel acknowledged that Reed Smith engaged in all of the alleged conduct on behalf of Alpha Beta.

[13] Neither party points to a Connecticut case in direct support of its respective position, nor have we found one. Nevertheless, we note that several jurisdictions have applied defensive collateral estoppel to bar subsequent litigation in the specific context of a principal-agent relationship. See, e.g., *Griffin* v. *Sirva, Inc.*, 291 F. Supp. 3d 245, 247, 252–54 (E.D.N.Y. 2018) (concluding that plaintiff employees were collaterally estopped from relitigating, as against defendant, whether defendant's subsidiary violated state human rights law when earlier litigation resulted in jury verdict in favor of subsidiary); *Cook* v. *Detroit*, 125 Mich. App. 724, 734, 337 N.W.2d 277 (1983) (applying collateral estoppel to bar negligence action against city when earlier action against city police officers absolved them of negligence).

[14] "Historically, the doctrine of collateral estoppel, or issue preclusion,

required mutuality of the parties. The general rule of issue preclusion is that [w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim. . . . Under the mutuality rule, [p]arties who were not actually adverse to one another in a prior proceeding could not assert collateral estoppel against one another in a subsequent action. . . .

"The mutuality requirement has, however, been widely abandoned as an ironclad rule. We have held that the [mutuality] rule will no longer operate automatically to bar the use of collateral estoppel . . . ." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *Torres* v. *Waterbury*, 249 Conn. 110, 135–36, 733 A.2d 817 (1999).

————————————————————